The Commissioners.
After stating the above facts],—The child survived thirty-six hours, during all which time, although the mother was in the same room with it, she manifested no interest in its sufferings, took no notice of its cries, and had even to be compelled by a forcible command to give it a drink of water. During all this time she did not speak unless spoken to, appeared listless and apathetic, and moved about as one might do who was not fully awake, which, as a pathological fact, was in truth her exact mental condition.
■ The evidence showed that Mrs. Jenisch was an affectionate and indulgent mother, always treated her children kindly, and never exhibited any cruelty or brutality towards them. Indeed, she was never known to punish them, even when they deserved it. Her sudden and unnatural change of demeanor towards her little girl during the hours of torture which followed her burning, were so diametrically at variance with her habitual conduct, that nothing but disease can explain it. The two physicians, one the coroner’s and the other the family, who saw her in the last hours of her child’s life, and at the inquest, were of opinion that she was simply imbruted by drink, and that upon no ■other principle could they account for her insensibility to the scene of suffering, which for thirty-six hours was passing beneath her eyes. There was no evidence, however, that the defendant had been intoxicated within any reasonable interval of time preceding the homicide. She certainly was not so the day before, when engaged in moving, she was not so when she went to bed upon a glass of ale ; she was still less so at six next morning, and after her epileptic seizure she was constantly surrounded by those in attendance upon her child, and never went out of the house ; her husband is not a drinking man, but a steady, industrious German, so that the commissioners could see no ground *205 for the presumption, upon which these gentlemen founded their opinion, that Mrs. Jenisch was sane at the time she placed her child upon the stove.
The physical evidence of the epileptic seizure was direct and unimpeachable, the internal evidence, from her subsequent behavior, was cumulative and corroborative of the fact that she had been in an epileptic circle since six o’clock in the morning, and was not freed from its mental obscuration for at least thirty-six hours. Ail acts done by her, within that period, were tinged with the prevailing hue of her mental condition, and could be gauged, if at all, only by a pathological standard. To those unfamiliar with the chameleon f bases of epilepsy, it will always be incomprehensible, how a person not m a somnambulistic state, but popularly speaking, awake, may still be in such a condition of disputed self-identity, as to perform acts involving reflection, without recognizing his or her true relations to them. Self-objectivity, which is the highest form of mental intensification, appears to be interrupted in all cases of diminished mental activity. Hence, between the point of extreme self-consciousness and extreme self-obliviousness, there are innumerable shades o: mental obscuration, during which we see ourselves, if at all, under larger or smaller angles of recognition, now in apogee, now in perigee, now in quadrature, now in full-face. It is through all these stages of mental obscuration, differing in extent of area, and in intensity, as well as duration, that epileptics are compelled to pass.
So far as any conjectural explanation of Mrs. Jenisch’s conduct can be framed from the laws of mental action, it would appear that in returning to her room, the dominant idea in her mind was that of kindling her fire. When the epileptic seizure supervened it did not expunge it. As soon as she was able to command her limbs, she probably proceeded to the stove, threw *206 the rimmer and cross-piece into the grate, piled coal and wood promiscuously upon them; and then, assuming that she had been in the habit of washing and dressing her little girl while the fire was kindling at norning, she may have taken her from the bed, and by mistake for a tub, put her feet foremost into the open stove-grate, seating her upon its edge. The locality and extent of the child’s burns would seem to indicate1 this. The difficulty at this point is to explain how a child four years of age, should not have struggled with its hands, to raise its body from the fire, which was burning it, to the extent even of burning its hands or arms, yet nothing of the kind was seen upon them. It may be that the child clung to her neck, nor is this unlikely, since a slight bruise was found upon the mother’s eye, which may have been inflicted by the despairing child clutching at her neck. The nightgown worn by the child was never found. It must certainly have been consumed. The little boy, in his statement, says that his mother put it into the stove. But he could not tell who put the clean night-gown upon his sister, although he does say that his mother replaced her in bed. Was this burning of the old night-gown an act of concealment % The evidence seems to negative this conclusion, for the smoke-.stained under-shirt was left upon the child, to tell the story of the burns upon its body. Besides, there could be no object in preserving a half-burnt garment, which neither proved nor disproved anything. Of course, the putting of a fresh night-gown on the child might be construed into a reasonable knowledge, on the part of the mother, that it was needed as a protection on that winter’s morning, just as much as replacing it into bed and covering it up did. But it did not absolutely prove any knowledge of the particular circumstances under which that necessity had arisen, or of her true relations to the circumstances ; and as their *207 originator, she was evidently only an automatic actor of her own acts. When her husband came in and found her at the stove, she was still under duress to the dominant idea that, she was kindling- the fire, although everything, coal, wood and rimmers were in a promiscuous heap in the stove. . .
From the foregoing facts and findings obtained from the months of witnesses, whose testimony [which was annexed to the report], remains unimpeached, the commissioners respectfully report the following conclusions as their opinion upon the question of the mental sanity of the defendant, Isabella Jenisch, at the date of the offense with which she stands charged :
I. That she is a person in whom the disease known as epilepsy has long existed.
II. That on the morning of Friday, November 20, 1874, she was attacked by an epileptic seizure, from whose' immediate consequences she was not freed for the space of over thirty-six hours.
III. That, assuming that within one hour after the invasion of such convulsion, she placed her child, Carrie Jenisch, upon a fire kindled in her stove and held her there, subsequently changed her night-gown, and replaced her in bed ; assuming these facts to have been established by circumstantial evidence, amounting to a moral certainty, the commissioners are of opinion that tne defendant, Isabella Jenisch, when, and during the time she was engaged in the performance of these acts, was still within the shadow of the epileptic circle, did not knov the nature, nor intend the consequences of the act she was performing, by reason of mental aberration the product of disease, and was in consequence, within the intent and meaning of the statute, insane and irresponsible.*
*208 The presiding justice approved the findings of the: commission, and an order was accordingly made for the removal of the prisoner to the State Lunatic Asylum, at Etica, where she still remains.

 Note by Commissioner Obdbonaux.—It will be noticed that the commiss, mers, at the termination of their report, do not say that Mrs. Jenisch ‘'' continues insanea statement which has generally in *208 past times been, considered essential, though, when properly examined, will be found to have no basis, either in law or science, to justify its-recital. In the present case, they did not insert that finding, because—
I. The statute does not call for it, and
II. Because the principle of law upon which the statute rests is. this, viz., that when an inquisition has found a person to be insane,
the presumption of the continuance of such insanity arises as a conclusion of law. Hence, a mere negative inference of such person’s return to sanity, can not annul a legal judgment to the contrary, for in the eye of the law he continues insane until such finding is judicially vacated. The commissioners found that Mrs. Jenisch was-insane by reason of epilepsy, on November 20 and 21, 1814. It was also in evidence that she had another seizure in December. They made their report on January 14. Could any preaumpti .n, either in-law or in science, arise that she had meanwhile recovered h-r sanity, and was a fit subject for discharge from all restraint ?
But let us suppose that they had made such a supererogatory statement as that she continued insane on January 14. What would it have been worth on the 26th, when the court made the order for her removal to Utica, unless the commission had continued in session until that time, so as to be able to certify to such insanity to the very last minute ?
It was enough that she had been found insane within a reasonable time, meaning a few months, to justify the presumption that she continued so. Any other statement relating to days and dates of continuance would have expired at sunset of the day on which it was made, and necessitated a fresh proof and fresh demonstration on every succeeding morrow. Before blindly following rules of law, so-called, it is always safest to ascertain whether such rules have any foundation in reason for their existence, and if they are shown to have none, then the mere authority of a name should not be allowed to give to .error prescriptive right by mere lapse of time. Nam plus est in opinion» qwm in veritate (Digest, XXIX, 8, 15).